TRUCK INSURANCE EXCHANGE, a Corporation,
Appellant, *v.* WALTER W. WHITAKER and
ROBERT E. MUSGRAVE, Copartners, Doing
Business as Valley Livestock Transportation,
Respondents.

No. 3792

January 5, 1955. 278 P.2d 277.

(Rehearing denied January 28, 1955.)

*Goldwater and Hill,* of Reno, for Appellant.

*Stewart and Horton,* of Reno, for Respondents.

## OPINION

By the Court, MERRILL, C. J.:

This is an action brought by respondents upon an oral contract of insurance to recover compensation for motor vehicle upset. Judgment of the trial court pursuant to jury verdict, was in favor of respondents in the sum of $6,500; and this appeal is from that judgment. Appellant contends that no oral contract of insurance ever existed and this is the principal question involved upon this appeal.

In 1948 respondent Musgrave operated a cattle auction and sales yard in the city of Fallon. As a part of his operations he owned a number of trucks used in transporting cattle to and from the yard in connection with the sales transactions. During this same year respondent Whitaker was engaged in the business of livestock transportation, in the course of which he used two large tractor-trailer combinations.

In February 1949, Whitaker purchased a one-half interest in the auction sales yard of respondent Musgrave and the new partnership assumed the name of Valley Livestock Sales Yard. While the assets of the sales yard, including its trucks, were taken in ownership by the new partnership, Whitaker retained sole title

to his tractor-trailers which continued in the business of livestock transportation. The two businesses (livestock sales and livestock transportation) were, however, consolidated and thereafter operated as a single business enterprise save for bookkeeping segregation.

At the time of the formation of the partnership, all motor vehicles were covered by a flat-rate insurance policy issued by appellant insurance company for public liability, property damage, collision, fire and theft. In March 1949 the partners concluded that their motor vehicle insurance could more economically be had by changing from a flat-rate policy to a gross-receipts policy under which premiums would be fixed at a rate computed upon the gross receipts received from the operation of the insured vehicles. Appellant, through its local agent, Stanley Hyman, prepared such a policy. The vehicles covered, however, included not only those which hauled for revenue but also those which hauled for the sales yard in the normal course of its business and thus received no revenue for their hauling. The result was a rate of insurance which staggered the partners. Agent Hyman was summoned, posthaste, to accomplish a revision.

In the forepart of April 1949 a conference was held respecting this matter, to which we shall later refer in more detail. Resulting from this conference two policies of insurance were issued by appellant company. One covered the vehicles owned by Whitaker which were engaged in the transportation business. It was a gross-receipts policy and included cargo and collision coverage as well as public liability, property damage, fire and theft. The policy covered not only the scheduled vehicles but, as to bodily injury and cargo, any vehicles hired or used by the insured. The rate for the listed, owned vehicles, with full coverage, was $6.10 per $100 revenue. For hired vehicles with limited coverage, the rate was $2.43 per $100 of revenue.

The second policy was a flat-rate policy covering the

vehicles owned by the partnership and used in the sales yard business. It did not include collision or cargo insurance.

Among the vehicles owned by the sales yard, covered by its flat-rate policy and not covered by the Whitaker gross-receipts policy was a Diamond-T tractor and Fruehauf trailer combination. In October 1949 this combination unit, loaded with hogs sold to a California meat company, was wrecked while crossing the Sierra enroute to the purchaser. Claims for cargo and collision loss were filed with appellant. The cargo claim was allowed upon the apparent theory that the tractor-trailer at the time was being hired or used by Whitaker under his policy. The collision claim was disallowed; and this action resulted.

Respondents contend that their insurance coverage was not limited to that specified by the two written policies. They contend that an oral contract was made between themselves and appellant, through its agent Hyman, whereby any of the sales yard trucks normally not engaged in revenue hauling, which might engage in such hauling, would, while so hauling, be insured for cargo and collision upon the same terms and for the same rate as applied to the Whitaker trucks under the gross-receipts policy. Appellant does not question the authority of its agent, Hyman, to enter into such a contract. It denies that such an agreement ever was reached. By its verdict the jury apparently found that the minds of the parties had met upon such an engagement.

Appellant's first contention is that there is no evidence in the record upon which such a factual determination could have been based. We feel there is ample evidence. It lies primarily in the testimony of respondents and their employees as to conversations had with agent Hyman. These conversations were flatly denied by Hyman. The responsibility of the jury under these circumstances was clear. It must decide which version of the conversations was entitled to belief. Clearly it

decided in favor of the testimony of respondents and their employees.

Testimony in support of the oral contract divides the conversations into two groups: those prior to the issuance of the policies in which insurance was discussed and ordered; those after issuance of the policies in which the existence of the coverage was confirmed. Five witnesses testified on behalf of respondents. Without specifying the source of the testimony and paraphrasing it for purposes of clarity, their statements present the following story:

Agent Hyman having been summoned to accomplish a revision of the first gross-receipts policy, a conference took place in which Musgrave and certain employees participated. Hyman was advised that, in the interests of economy, the sales yard would eliminate collision and cargo insurance on its trucks. Since its operations normally were within a limited radius of Fallon, it was felt that the risk would not be too great. The large trucks owned by Whitaker, however, engaged as they were in interstate revenue hauling over mountainous routes, would require full coverage. The result of this discussion was agreement upon the two policies eventually issued. Hyman was then advised that in occasional emergencies sales yard trucks would be drafted into revenue-transportation service, and that these, therefore, should also be covered for cargo and collision. Hyman advised that these could not be included in the gross-receipts policy with full-time cargo and collision coverage without increasing the minimum premium or premium rate. He stated, however, that appellant, without increase of premium, would give them cargo and collision coverage limited in time to the periods when they were actually engaged in revenue hauling. All that would be necessary to accomplish such coverage would be to report their receipts for such trips and pay premium thereon in the same manner and at the same time that receipts were reported and premiums paid under

the policy set up for the units regularly engaged in revenue hauling.

After issuance of the policies Hyman conferred with Mrs. Childers, respondents' office secretary and book-keeper. He confirmed to her that unlisted sales yard trucks were covered for cargo and collision loss on their revenue hauls, provided the receipts of such hauls were reported and premiums thereon paid. He instructed her as to the manner of reporting revenue and paying premiums. She was advised to report this revenue on the form provided by the insurance company for the gross-receipts policy under the column headed "Total Receipts From Hired Trucks," and to pay thereon the rate of $6.10 per $100 of revenue. Mrs. Childers pointed out to Hyman that under this insurance arrangement the trucks with part-time coverage would be paying double premium on public liability, property damage, fire and theft, since the $6.10 rate on the gross-receipts policy included such coverage and the trucks already were covered for such risks under their flat-rate policy. She protested that this was unfair. Hyman advised her that this was, however, the only method he could suggest for securing the additional limited coverage and that it would still be cheaper than full-time cargo or collision coverage, either under a flat-rate or gross-receipts premium. Mrs. Childers thereafter reported revenue under the hired trucks column at the $6.10 rate for various unlisted trucks, although (since the report form did not call for specification) the trucks were not individually specified.

Following the accident, Hyman confirmed to respondents and certain employees that the truck involved was covered. In this respect he took issue with appellant's adjuster who visited the sales yard with him. The adjuster pointed out that Mrs. Childers had been paying the $6.10 rate on revenue reported in the hired trucks column, rather than the reduced rate provided by the policy. Hyman asserted that Mrs. Childers had been

paying the proper rate. (Documentary evidence establishes that in February 1950, four months after the accident, appellant by check tendered a refund on premiums paid on "hired trucks" at the $6.10 rate, noting that the lesser premium was applicable. This check was never cashed by respondents.)

When appellant failed to make compensation, Hyman gave repeated assurance that it would be made. He stated that he would make a trip to confer with company officials and explain the matter in detail since these matters were hard to explain by letter. He later stated that he had made the trip and that the company had agreed to make compensation. Still later he advised that the company had changed its mind.

All of this testimony we must assume the jury found credible and entitled to belief.

Appellant draws our attention to many factors, in addition to Hyman's flat denial, reflecting upon the credibility of this story. It is emphasized as unreasonable to the point of incredibility that respondents could have imagined themselves covered by an oral contract when two written policies had been issued, neither of which included such coverage. Respondents and their witnesses, however, admitted and demonstrated a lack of knowledge of insurance matters and a reliance upon Hyman in all such respects. While it undoubtedly is common business practice to reduce contracts of insurance to writing, it does not follow that they must be in writing in order to be valid. For us, in the face of the jury's determination, to convert the fact of common business practice into a principle of law, would be to expand our statute of frauds by judicial legislation. All factors upon which appellant relies, reflecting upon the credibility of respondents' story, are matters which we must assume were duly taken into consideration by the jury in its search for the factual truth.

We conclude that there is ample support for the jury's determination that an oral contract of insurance existed as contended by respondents.

Appellant contends that the oral contract as established by testimony, was so uncertain and incomplete as to render it unenforceable. No such details as liability limits or values of property covered were specified. None of the many, carefully worded conditions normally set forth in written policies is mentioned. The testimony was, however, to the effect that the conditions and rates provided in the gross-receipts policy would control as to sales yard trucks; that when coverage should apply, the conditions of coverage would be the same as for the units regularly engaged in revenue hauling. As to details of the unlisted vehicles so covered, they were within the knowledge of the company through the flat-rate policy. With the aid of reference to the two written policies, which reference the oral contract clearly contemplated, that contract was sufficiently definite to permit of enforcement.

Appellant next contends that the oral contract varies and contradicts the terms of the gross-receipts policy and thus violates the parol evidence rule. It is pointed out that the gross-receipts policy expressly limits its collision coverage to the trucks listed in the policy; that it expressly provides that it embodies all agreements between the parties "relating to this insurance." It is argued that to give to unlisted trucks the coverage provided by the written policy contrary to the expressed limitations of that policy, varies and contradicts its terms and provisions by parol. Respondents contend that the oral contract was a separate agreement, independent of and collateral to, the written policy; that the parol evidence rule thus does not apply.

The question is as to the extent to which the parties

intended the written policy to constitute an integration of their engagements upon the general subject of insurance. In 9 Wigmore on Evidence (3d edition) 8, sec. 2401, the question is stated as follows: "whether a particular document is the one deemed by law to be the sole memorial of the act, or how far a particular document was intended by the parties to cover certain subjects of transaction between them and therefore to deprive of legal effect all their other utterances." If the subject of the oral contract is different from that of the policy, it can hardly be said to vary or contradict the terms of the policy; it can hardly be contended that the policy constitutes an integration of the terms of the oral contract.

It is to be noted that the coverage provided by the oral contract is not the kind of coverage provided by the written policy; that the written policy could not, without material change, have provided the desired coverage. Indeed, it was to escape the high premium rate which inclusion in the written policy would have caused that resort to an independent contract was had. What was required was not the full-time coverage provided by the policy but was limited coverage in the nature of trip insurance.

The test proposed by Professor Wigmore to determine between complete and partial integration is "whether or not the particular element of the alleged extrinsic negotiation is dealt with at all in the writing." 9 Wigmore, supra, 98, sec. 2430. Clearly it was not in the case before us. Under this test, then, it cannot be said that the parties intended the written policy to cover the subject of the oral contract. The policy was but a partial integration and the parol evidence rule would not apply.

Upon this fundamental question of identity of subject matter, a stricter and perhaps more practical test than Professor Wigmore's, is advocated by some authorities. This test does not limit the inquiry to the question whether there has been an expression in writing upon the particular element involved. It requires the further

inquiry whether, if there had been an agreement as alleged, the parties would normally have incorporated it in the writing. Mitchill v. Lath, 247 N.Y. 377, 160 N.E. 646, 68 A.L.R. 239; See: 3 Williston on Contracts (Rev. Ed.) 1833, sec. 638; Ann. 70 A.L.R. 752, 759. For purposes of determining identity of subject matter, the controlling factor is thus expanded from Professor Wigmore's "particular element" to include all elements which the parties reasonably might have been expected to include.

We need not decide between these authorities as to the proper test for partial integration or collateral agreement. Even under the stricter rule, the oral contract in this case must be held to be collateral and independent.

The limited scope of the inquiry may well be emphasized. It is not whether the parties would normally have incorporated the collateral agreement in *a* writing (which question fell within the jury's area of determination as we have already discussed) but in *the* writing into which they actually entered.

The general subject of all negotiations between the parties was the insurance of respondents' motor vehicles. All engagements of appellant related to this general subject. In many respects, however, those engagements differed in character, depending upon such factors as truck ownership and identity of the insured, trucks and risks covered and type of premium involved. It may well be that, regardless of such differences, the expression of all such engagements could have been included in one comprehensive document. The undisputed fact is that this was not done. There was not a single, complete integration. There were at least two separate agreements. Appellant must itself concede that the subjects of the two policies were regarded as so unrelated as to make a combination of the two inappropriate.

It may well be that, regardless of differences in ownership, coverage and premium, the subject of the oral contract could have been combined with that of either

of the two policies through an enlarging of the particular subject of that policy. We are wholly unable to say, however, that under the circumstances of this case, this is what the parties might have been expected to do. A consideration of matters of ownership, coverage and premium, demonstrates that neither policy was an appropriate vehicle for the particular subject of the oral contract. Under the circumstances of this case, that subject as logically and reasonably required a separate agreement as did the subjects of the two policies.

The gross-receipts policy cannot, then, be said to constitute an integration of the subject of the oral contract. That contract must be held to be collateral to and independent of the policy. The parol evidence rule does not apply.

The fact that reference must be had to the policy in order that the terms of the oral contract be fully understood, cannot affect our holding in this regard; nor can the fact that premiums due under the oral contract were reported and paid together with those due under the policy. These facts, under the circumstances, are entirely consistent with the existence of the oral contract and cannot be said to accomplish an integration where one clearly was not intended.

Appellant assigns as error the giving of Instruction No. 31 which deals with the legal effect of a voluntary acceptance by appellant of premiums due under the oral contract and of a subsequent tender back of those payments by appellant. Appellant's objections to this instruction are that the word "premium" is not defined and that the instruction appears to assume as fact that there was a voluntary acceptance and that liability for loss arose prior to the tender back. The instruction, however, expressly requires a finding that the contract existed, before the significance of the acceptance or tender might be considered. We do not see how any error in connection with the instruction could be regarded

as prejudicial, save in the event appellant denied the authority of Agent Hyman, and an issue of ratification by appellant was thus raised. This was not the case.

Appellant assigns as error the giving of Instruction No. 37 to the effect that the fact that no appraisal of collision damage was made by appellant constituted no defense. Appellant's objection is that it never contended that such fact constituted a defense and that the instruction thus injects into the case something which was not properly a part of it. We do not see, however, that any prejudice could have resulted from the giving of this instruction.

Appellant assigns as error the refusal of the court to give its proposed Instructions "A" and "B," both of which are to the general effect that respondents' failure to require that the oral contract be incorporated in a written policy should defeat their claim. These are but reflections of appellant's contentions regarding the existence of the oral contract and the effect upon it of the parol evidence rule. In the light of the facts and of our opinion on these subjects as heretofore expressed, these instructions cannot be said to constitute a true statement of the applicable law.

Appellant assigns as error the jury's verdict in favor of respondents, of $712.63 cargo loss, and the court's refusal to grant a new trial as to this item of recovery. Appellant points out that respondents did not ask any such recovery since they had already received compensation for cargo loss; that, on the contrary, appellant had counter-claimed for a return of said amount. Undoubtedly confusion does exist upon this subject which requires clarification. The confusion, however, results largely from action of appellant. The record demonstrates that appellant by its own withholding of sums due to respondents has, in effect, recovered back

the sum of $712.63 paid by it as compensation for cargo loss. Under the circumstances, the jury verdict must be held simply to be a determination that appellant should not recover on its counterclaim; that respondents were entitled to compensation for cargo loss; that appellant was not entitled to withhold it from them; that appellant should restore respondents to the position they occupied before appellant's action of withholding. Under this interpretation, which we hereby place upon the jury verdict, it cannot be regarded as improper.

Judgment affirmed with costs.

BADT and EATHER, JJ., concur.